**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ISTVAN SZONYI,

*Petitioner*,

v.

WILLIAM P. BARR,
Acting Attorney General,

*Respondent.*

No. 15-73514

Agency No.
A010-977-327

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 10, 2018
Portland, Oregon

Filed February 13, 2019
Amended November 13, 2019

Before:  Raymond C. Fisher, Richard R. Clifton,
and Consuelo M. Callahan, Circuit Judges.

Order;
Dissent to Order by Judge Collins;
Opinion by Judge Clifton;
Dissent by Judge Fisher

# SUMMARY[*]

### Immigration

The panel filed: 1) an order amending its prior opinion, denying panel rehearing, and denying, on behalf of the court, rehearing en banc; and 2) an amended opinion denying Istvan Szonyi's petition for review of a decision of the Board of Immigration Appeals.

In the amended opinion, the panel upheld the BIA's interpretation of the phrase, "single scheme of criminal misconduct," which operates as an exception to the ground of removal, under 8 U.S.C. § 1227(a)(2)(A)(ii), for a person who has been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct."

In *Matter of Adetiba*, 20 I. & N. Dec. 506 (BIA 1992), the BIA affirmed the following interpretation of the phrase "single scheme of criminal misconduct": "when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct." The BIA said that it would apply this interpretation in all circuits except those that had adopted more expansive interpretations. That exception applied to this circuit, whose previous interpretation of the phrase encompassed distinct crimes that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

were part of the same overall plan.  However, in *Matter of Islam*, 25 I. & N. Dec. 637 (BIA 2011), the BIA announced that it would apply the interpretation from *Matter of Adetiba* in all circuits.

Szonyi, a lawful permanent resident, forced three women to commit sexual acts under threat of violence over a five- to six-hour period.  For those acts, Szonyi pled guilty to two counts of oral copulation in violation of California Penal Code § 288a(c) and two counts of sexual penetration with a foreign object in violation of California Penal Code § 289.  Based on these offenses, the BIA ultimately concluded that Szonyi was removable because his crimes did not arise out of a single scheme under BIA precedent.

The panel rejected Szonyi's argument that this court's precedent forecloses the BIA's interpretation of the phrase "single scheme of criminal misconduct," upholding the BIA's interpretation under principles of deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984).  As a preliminary matter, the panel concluded that, because the BIA's position appeared to be set based on its opinion in *Matter of Islam* at the time of Szonyi's proceedings, Szonyi did not have to exhaust his challenge to the BIA's interpretation.

Observing that, under *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), the court does not defer, under *Chevron*, where a prior court decision holds that its construction follows from the unambiguous terms of the statute, the panel concluded that no circuit precedent held that the text of the statute unambiguously foreclosed the BIA's interpretation here.  The panel also rejected Szonyi's contentions that the BIA's interpretation was impermissible

based on congressional intent and constitutional avoidance. With respect to the latter issue, the panel explained that the Supreme Court's recent vagueness jurisprudence is distinguishable from the present case.

The panel also rejected Szonyi's argument that, even if the BIA's construction of the statute was permissible, the agency could not retroactively apply that standard to this case. Analyzing the relevant factors set out by *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982), the panel concluded that, on balance, the retroactive application of the BIA's interpretation was not improper. The panel further rejected Szonyi's argument that, even under BIA precedent he was not removable, concluding that the BIA's analysis was consistent with its precedent.

Finally, the panel upheld the agency's denial of discretionary relief, rejecting Szonyi's contention that the BIA failed to consider all favorable and unfavorable factors bearing on his eligibility.

Dissenting, Judge Fisher disagreed with the majority's conclusion that the BIA reasonably applied its precedent to this case. Judge Fisher wrote that BIA precedent squarely holds that two or more crimes committed during a single criminal episode arise from a single scheme of criminal conduct unless they are marked by a "substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done" between crimes. Judge Fisher would grant the petition for review and remand to the BIA for an adequate explanation because it cannot be discerned from the record whether or how the BIA applied this precedent in this case, where the petitioner's crimes were part of a single and continuous criminal episode,

and there was nothing in the record to suggest there was a "substantial interruption" between the crimes.

Dissenting from denial of rehearing en banc, Judge Collins, joined by Judge Bea, wrote that this case well illustrates why the *Chevron* doctrine has become the subject of so much recent criticism. Noting the separation-of-powers concerns that arise where, as here, the *Chevron* doctrine has the effect of placing the ability to construe authoritatively the limits on an agency's power in that agency's own self-interested hands, Judge Collins wrote that it is critical that courts enforce *Chevron*'s condition that an agency's construction of an ambiguous provision merits deference only if it is a reasonable reading of the *actual words* of the statute. Judge Collins wrote that the panel failed to do that here; instead, it upheld an agency construction that this court has consistently *rejected* as being based on an impermissible rewriting of the statutory text.

With respect to step one of *Chevron*, Judge Collins agreed with the panel's conclusion that the relevant statutory language is ambiguous, and that nothing in the court's precedent required a contrary conclusion. However, Judge Collins wrote that the BIA's construction of the phrase is unreasonable under *Chevron* step two, and should be rejected. Accordingly, Judge Collins concluded that the proper course would be to remand the matter to the BIA to adopt a new construction that interprets, rather than rewrites, the statute.

**COUNSEL**

David Timothy Raimer (argued), Jones Day, Washington, D.C.; Meir Feder, Jones Day, New York, New York; for Petitioner.

Leslie McKay (argued) and Bryan S. Beier, Senior Litigation Counsel; Terri J. Scadron and John W. Blakeley, Assistant Directors; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Jennifer Lee Koh and Andrew Michael Knapp, Western State College of Law, Irvine, California, for Amicus Curiae American Immigration Lawyers Association.

**ORDER**

The opinion filed on February 13, 2019, is hereby amended as follows:

1.  On page 15 of the slip opinion, in the first full paragraph, replace:

> As of then, however, the BIA itself had consistently applied its own narrower approach. It was not until 1992, a decade after Szonyi pled guilty, that the BIA announced that it would only apply its interpretation outside circuits, like the Ninth Circuit, that had adopted a more expansive interpretation. *Id*. at 511. Thus, at the time Szonyi pled

guilty, it could reasonably have been anticipated that the BIA would apply its own interpretation.

with the following:

As of then, however, the BIA had not clearly indicated whether it would follow these broader interpretations or its own precedent. It was not until 1992, a decade after Szonyi pled guilty, that the BIA announced that it would apply its interpretation outside circuits, like the Ninth Circuit, that had adopted a more expansive interpretation. *Id*. at 511. Thus, at the time Szonyi pled guilty, it should not have come as a "complete surprise" that the BIA would apply an interpretation that held him removable. *See Lemus*, 842 F.3d at 649.

With these amendments, Judge Clifton and Judge Callahan have voted to deny the petition for panel rehearing. Judge Fisher has voted to grant it. Judge Callahan has voted to deny the petition for rehearing en banc, and Judge Clifton has so recommended. Judge Fisher has recommended granting it.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc (Docket Entry No. 67) are otherwise **DENIED**, no further petitions will be accepted.

---

COLLINS, Circuit Judge, with whom BEA, Circuit Judge, joins, dissenting from denial of rehearing en banc:

This case well illustrates why *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), has become the subject of so much recent criticism. Under *Chevron*, we are required to give deference to an agency's reasonable construction of ambiguous language in a statute that the agency is charged with administering. *Id*. at 842–43. Where, as here, the ambiguous provision at issue imposes an express legislative *constraint* on the agency's authority, the *Chevron* doctrine has the effect of placing the ability to construe authoritatively the limits on an agency's power in that agency's own self-interested hands. It is troubling enough that *Chevron* "concentrate[s] federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design," *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring), but "when deference is applied to . . . an agency's interpretation of the statutory provisions that concern *the scope of its own authority*, it is more troubling still," *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring) (emphasis added). Given these separation-of-powers concerns, it is critical that courts rigorously enforce *Chevron*'s condition that an agency's construction of an ambiguous provision merits deference only if it is a reasonable reading of the *actual words* of the statute. The panel failed to do that here. Instead, it upheld an agency

construction that this court has consistently *rejected* as being based on an impermissible rewriting of the statutory text, rather than an interpretation of it. In doing so, the panel improperly disregarded controlling precedent and applied an excess of deference that "suggests an abdication of the Judiciary's proper role in interpreting federal statutes." *Id*. We should have taken this case en banc.

In the provision at issue here, Congress expressly limited the Government's power to deport aliens based on their commission of "two or more crimes involving moral turpitude" by specifying that the Government may not count to two simply by carving up a "single scheme of criminal misconduct" into multiple separate charges. *See* 8 U.S.C. § 1227(a)(2)(A)(ii). Because the Immigration and Nationality Act ("INA") is administered by the Attorney General and the Board of Immigration Appeals ("BIA"), the Supreme Court has held that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *Negusie v. Holder*, 555 U.S. 511, 517 (2009) (citations and internal quotation marks omitted). Unsurprisingly, when asked to construe this statutory limit on the agency's own power, the BIA adopted an exceptionally narrow view of what constitutes a "single scheme of criminal misconduct," thereby allowing it more easily to divide up a single criminal episode into multiple crimes and expanding its power to order deportation. Under the BIA's construction, the "single scheme" exception applies *only* when two crimes follow so closely together that the offender essentially had no opportunity to cease his activities and reflect on what he had done. For sixty years, however, this court has consistently refused to follow that construction because we correctly recognized that it rewrites the statute "as if it read 'single

criminal *act*'" rather than "'single *scheme* of criminal misconduct.'" *Wood v. Hoy*, 266 F.2d 825, 830 (9th Cir. 1959) (emphasis added). Having rejected the BIA's position as legally impermissible, we proceeded to apply our own construction, under which two or more crimes will constitute a "single scheme" if they "were *planned* at the same time and executed in accordance with that plan." *Gonzalez-Sandoval v. INS*, 910 F.2d 614, 616 (9th Cir. 1990) (emphasis added).

But after the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005), the BIA decided that it was time for us to fall in line, and it started refusing to follow *Wood* even in cases arising in this circuit. Unfortunately, the panel in this case has now surrendered to the BIA's flawed construction, and in doing so, it has squarely contravened *Wood*'s holding that the BIA's interpretation rests on a legally impermissible rewriting of the text.

Although I think that the panel thus erred in failing to follow *Wood*'s rejection of the BIA's interpretation, I cannot fault the panel for concluding that the BIA is not required to adopt the alternative construction of "single scheme" that this court enunciated in *Wood* and its progeny. *Wood* itself correctly recognized that the key phrase at issue here—"arising out of a single scheme of criminal misconduct"—is ambiguous, and under the Supreme Court's binding decision in *Brand X*, that means "the agency remains the authoritative interpreter (within the limits of reason)" of this provision. 545 U.S. at 983. Accordingly, *Brand X* and

*Chevron* require us to allow the agency, on remand, to propose an alternative reading of the statutory text that is reasonable. And I especially cannot fault the panel on this score when I agree with the BIA that this court's alternative construction is itself wrong. Under *Wood*'s reading of "single scheme," we have wrongly ignored the objective connections that are inherent in the concept of a "scheme," and we instead have given dispositive weight to whether multiple crimes were planned together. As the BIA has noted, this flawed subjective approach has the perverse consequence of favoring more culpable criminals who pre-plan a crime spree over those who commit the very same crimes without such forethought.

A remand to the agency is particularly appropriate here, because this is *not* a case in which the petitioner would lose under any conceivable reading of "single scheme," thereby rendering pointless any such remand. The multiple crimes that render Petitioner Istvan Szonyi eligible for deportation were horrific—on an October night in 1981, he held three young women at gunpoint in a room for six hours while subjecting them to disgusting sexual abuse. Because these multiple crimes against multiple victims all occurred during a single episode in a single room, it is possible to posit reasonable competing interpretations of the phrase "single scheme of criminal misconduct," some of which would cover Szonyi's conduct and some of which would not. But in resolving that question, the agency needs to do what it has failed to do for many years—namely, to articulate a reasonable construction that is faithful to the meaning of the phrase "single *scheme*," rather than continue to apply a test that disregards that phrase and instead rewrites the provision as if it read "single *act*."

Because the panel's decision allows the agency to continue to enforce an unreasonable reading of the statute that disregards our precedent and that eliminates a congressional constraint on the agency's power, I respectfully dissent from our failure to rehear this case en banc.

## I

The statutory construction issue presented in this case arises against the backdrop of a long history of judicial interpretation of the relevant provision and its predecessor.

## A

For more than 100 years, the immigration laws of this country have provided for the deportation of specified persons who have committed "crimes involving moral turpitude." For example, in section 19 of the Immigration Act of 1917, Congress provided that any alien who commits a single felony "crime involving moral turpitude . . . *within five years* after the entry of the alien to the United States" would generally be subject to deportation, 8 U.S.C. § 155 (1946 ed.) (emphasis added), and the INA still contains a comparable provision, *see* 8 U.S.C. § 1227(a)(2)(A)(i). The apparent significance of the five-year limitation is that, once an alien has been lawfully in the United States for sufficient time to develop substantial ties to this country, a *single* felony crime of moral turpitude should no longer be sufficient to render that person automatically eligible for deportation. But Congress has also consistently specified that no such indulgence will be granted to those who commit *multiple* crimes of moral turpitude after their admission to the United States. Thus, in the 1917 statute, Congress generally provided for the deportation of any alien "who is hereafter

*sentenced more than once* to such a [felony] term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed *at any time* after entry." 8 U.S.C. § 155 (1946 ed.) (emphasis added). As a result, where an alien has been in the country for more than five years and commits a crime of moral turpitude, the Government's power to deport that alien will depend critically upon whether he or she has committed one such crime or two.

In 1948, the Supreme Court in *Fong Haw Tan v. Phelan*, 333 U.S. 6 (1948), resolved a circuit split over the proper construction of this multiple-crimes provision of the 1917 statute. Rejecting this court's view that any two convictions for separate crimes were sufficient to trigger the statute, even if the convictions were imposed at the same time and resulted in concurrent sentences, the Supreme Court instead held that an alien is "sentenced more than once" for a crime of moral turpitude when the "alien[,] having committed a crime involving moral turpitude and having been convicted and sentenced, once again commits a crime of that nature and is convicted and sentenced for it." *Id.* at 9–10. The Court explained that this reading of the statutory language was also consistent with its purpose, because by reoffending after a previous conviction, such a "repeater" had shown himself to be "a criminal of the confirmed type," with a "criminal heart and a criminal tendency." *Id*. at 9 (citations omitted).

As part of its overhaul of the immigration laws in 1952, Congress changed the language of this provision in a manner that unmistakably abrogated the rule recognized in *Fong Haw Tan*. Instead of reaching only the pure recidivist who reoffends after a prior conviction, the amended provision established a broader rule generally providing for the

deportation of an alien who "is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," and Congress expressly applied this new rule "regardless of whether the convictions were in a single trial."  8 U.S.C. § 1251(a)(4) (1952 ed.).  The current version of this provision, which reflects only minor wording changes from the 1952 version, is now contained in section 237(a)(2)(A)(ii) of the INA, and it provides as follows:

> Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1227(a)(2)(A)(ii).

As this text reflects, the broader any-two-crimes rule adopted in 1952 was subject to an important exception— namely, that an alien is deportable only if he or she is convicted of two crimes of moral turpitude "*not arising out of a single scheme of criminal misconduct*."  *Id.* (emphasis added).  Thus, while the multiple convictions could now occur at a single trial, the proviso that they could not arise out of a single scheme of criminal misconduct meant that the amended statutory language retained, albeit in a narrower form, the prior statute's comparable focus on *repeat* criminals who had demonstrated "lawless propensities."  *Costello v. INS*, 376 U.S. 120, 134 (1964) (White, J., dissenting).

**B**

In 1954, the BIA first articulated its very narrow construction of this new statutory limitation on the agency's power to deport an alien convicted of multiple crimes of moral turpitude. *See Matter of D—*, 5 I. & N. Dec. 728 (BIA 1954). In *Matter of D—*, the alien argued that separate convictions for obtaining property by false pretenses, committed against different persons on different days, should nonetheless be deemed to constitute a "single scheme of criminal misconduct," because the alien committed them "pursuant to a scheme or pattern to raise funds for a single purpose." *Id*. at 729. Although the BIA might have rejected this overbroad reading of the "single scheme" exception on any number of grounds, it instead held that the exception did not apply because, in its view, any two separate criminal acts would be deemed not to arise from a "single scheme." As the BIA explained:

> To us, the natural and reasonable meaning of the statutory phrase is that *when an alien has performed an act* which, in and of itself, constitutes a complete, individual and distinct crime then he becomes deportable *when he again commits such an act*, provided he is convicted of both. The fact that one may follow the other closely, even immediately, in point of time is of no moment. Equally immaterial is the fact that they may be similar in character, or that each distinct and separate crime is a part of an overall plan of criminal misconduct.

> We differentiate the foregoing situation from
> that wherein *two crimes flow from and are the*
> *natural consequence of a single act of*
> *criminal misconduct*.  That is, we distinguish
> it from the case where technically there are
> two separate and distinct crimes, but morally
> the transaction constitutes only a single
> wrong.  For example, a counterfeiter may be
> indicted in one count for possessing a bill, and
> in another for passing it, though he cannot
> pass it without having possession; so also, a
> person might break and enter a store with
> intent to commit larceny and in connection
> therewith commit an assault with a deadly
> weapon.

*Id*. at 729–30 (emphasis added); *see also Matter of Z—*,
6 I. & N. Dec. 167, 168–69 (BIA 1954) (same).

Five years later, in *Wood v. Hoy*, 266 F.2d 825 (9th Cir.
1959), we rejected the BIA's reading in *Matter of D—* as
flatly contrary to the statutory language.  As we explained,
the BIA's interpretation of the statute improperly rewrote
"the statute as if it read 'single criminal act'":

> We must take the language of the statute as
> we find it.  It says "not arising out of a single
> scheme of criminal misconduct"; it does *not*
> say "not arising out of a single criminal *act*."
> If such latter reading had been the intent of
> Congress they could have so declared.

*Id*. at 830.  Indeed, we noted that the Government in Wood's
case had acted "as if the words 'not arising out of a single

scheme of criminal misconduct' had not been added to the statute." *Id*. at 831. After reviewing the record and concluding that the Government had failed to show that the crimes were not part of a single scheme, we remanded the case "so that proper findings on the proper view of the law may be made." *Id*. at 832.

We have subsequently construed *Wood* as having gone beyond the rejection of the BIA's standard and instead affirmatively adopting its own *alternative* construction of the exception. As we have described it, *Wood* established that, where "two predicate crimes were *planned* at the same time and executed in accordance with that plan," they "arise out of 'a single scheme of criminal misconduct.'" *Gonzalez-Sandoval v. INS*, 910 F.2d 614, 616 (9th Cir. 1990) (emphasis added); *see also Szonyi v. Whitaker*, 915 F.3d 1228, 1233–34 (9th Cir. 2019) (panel decision in this case).[1]

The BIA, however, explicitly disagreed with the *Wood/Gonzalez-Sandoval* test for determining whether two crimes "aris[e] out of a single scheme of criminal misconduct," and it therefore declined to follow that test in cases arising in circuits that lacked comparable precedent. As the BIA explained, the test's "emphasis on whether the crimes are planned together and executed in accordance with that plan" was "clearly unjustified." *Matter of Adetiba*, 20 I. & N. Dec. 506, 511 (BIA 1992). According to the BIA, this emphasis on subjective planning "would result in extreme absurdities, as it would render" the two-crime deportability

---

[1] It is not entirely clear to me that *Wood* actually articulated and adopted the affirmative construction that *Gonzalez-Sandoval* attributed to it. But because nothing of consequence turns on the point (at least under my view of the matter), I will assume that *Wood* did so.

rule "completely inapplicable in any case where an alien committed several crimes, provided he first had the foresight to formulate a broad plan of criminal misconduct, even if he had numerous opportunities to reflect and to disassociate himself from his criminal enterprise." *Id*. Instead, the BIA reaffirmed *Matter of D—*'s holding that the two-crimes deportability rule applies "when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, . . . [and] he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct." *Id*. at 509.

Beyond reaffirming *Matter of D—* and its progeny, the BIA in *Matter of Adetiba* further elaborated that, in the BIA's view, the statutory exception to the two-crimes rule for multiple offenses that arise from a single scheme of criminal misconduct "refers to acts, which although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *Id*. at 511. The BIA acknowledged that, in addition to this court, courts in several other circuits had adopted a broader reading of the "single scheme" exception, but it nonetheless stated that it would "continue to follow our approach outside of those jurisdictions." *Id*. at 510.

Matters came to a head, however, after the Supreme Court's decision in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). In *Brand X*, the Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if

the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id*. at 982. Emboldened by *Brand X*, the BIA announced in 2011 that it would apply the construction it had articulated in *Matter of Adetiba* nationwide, including in jurisdictions that had previously disapproved of its interpretation. *Matter of Islam*, 25 I. & N. Dec. 637, 641 (BIA 2011). Noting that, even before *Brand X*, many circuits had already decided to give *Chevron* deference to the construction set forth in *Matter of Adetiba*, the BIA reasoned that, in light of *Brand X*, "the *Chevron* principle of deference must be applied to an agency's interpretation of ambiguous statutory provisions, even where a court has previously issued a contrary decision and believes that its construction was the better one, so long as the agency's interpretation is reasonable." *Id*. "In light of *Chevron* and *Brand X*, as well as the majority of Federal appellate court decisions that have given deference to our interpretation in *Matter of Adetiba*," the BIA stated that its "analysis there is controlling and should now be uniformly applied in all circuits throughout the country." *Id*.

## II

In upholding the removal of Petitioner Istvan Szonyi, the BIA applied the construction of "single scheme" it had articulated in *Matter of Adetiba*, notwithstanding our prior decision in *Wood*, and the panel upheld the BIA's statutory construction as reasonable and binding under *Chevron* and *Brand X*.

**A**

Szonyi is a native and citizen of Hungary who was admitted to the United States as a lawful permanent resident in 1957, when he was four or five years old. Over the last sixty years, Szonyi has resided exclusively in the United States.

On the evening of October 10, 1981, after drinking heavily throughout the day, Szonyi met three young women (a 19-year-old and two 17-year-olds) outside a nightclub located next door to the television repair shop where he worked. After the women were unable to gain admittance into the nightclub, Szonyi invited them into the repair shop. Once inside, however, Szonyi pulled out a gun and ordered all three women to undress. As later described in the probation officer's report during Szonyi's criminal case, "six hours of sexual horrors ensued," extending into the early morning hours of October 11, "with all types of sexual abuse being committed on the three girls." The nightmare only came to an end because one of the women was ultimately able to strike Szonyi over the head with an ashtray and then grab his gun. When Szonyi then retrieved a shotgun and threatened to shoot one of the other women, the same woman shot him with the gun, striking him in the shoulder. Szonyi then relented and allowed the women to escape.

Szonyi was arrested later that day. He ultimately pleaded guilty in December 1981 to a total of four separate counts involving two of the three women. Specifically, he pleaded guilty, separately with respect to each of the two women, to one count of oral copulation in violation of California Penal Code § 288a(c) and one count of sexual penetration with a foreign object in violation of California Penal Code § 289.

Szonyi was sentenced to twelve years in prison, and he was released on parole in 1988.

**B**

In November 2005, twenty-four years after commission of these offenses, the Government commenced removal proceedings against Szonyi. The Government charged Szonyi as removable because he had been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct" under section 237(a)(2)(A)(ii) of the INA, 8 U.S.C. § 1227(a)(2)(A)(ii).

On September 19, 2011, the immigration judge ("IJ") ordered Szonyi removed to Hungary. Applying this Court's decisions in *Wood* and *Gonzalez-Sandoval*, the IJ found Szonyi removable because the predicate crimes involved moral turpitude and, given their spontaneous and opportunistic occurrence, the crimes did not reflect the sort of planning necessary to make them part of a single scheme under this court's precedent.

Szonyi appealed this decision to the BIA. Because, in the interim, the BIA had decided in *Matter of Islam* to apply its *Matter of Adetiba* construction in all cases arising under section 237(a)(2)(A)(ii) of the INA, the BIA remanded the matter to the IJ to reconsider in light of *Matter of Islam*.

On remand, the IJ applied *Matter of Adetiba* and found Szonyi removable. The IJ again ordered him removed to Hungary, and the BIA upheld that decision on October 21, 2015.

**C**

Szonyi petitioned for review of the BIA's decision, arguing that the BIA's interpretation of "single scheme of criminal misconduct" was unambiguously foreclosed by the text of the statute and by this court's precedent. In light of *Brand X*, however, the panel declined to follow *Wood* and instead adopted the BIA's construction.

The panel reasoned that, under *Brand X*, it must defer to an agency's reasonable interpretation of an ambiguous statute "even if there is contrary circuit precedent, unless 'the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.'" *Szonyi*, 915 F.3d at 1233 (quoting *Brand X*, 545 U.S. at 982). Although this court held in *Wood* that the BIA's interpretation "is not what the statute says," 266 F.2d at 830, the panel concluded that in *Wood*, "[w]e did not say, though, that *our interpretation* 'follow[ed] from the unambiguous terms of the statute,' which would foreclose the agency's approach under *Brand X*." *Szonyi*, 915 F.3d at 1234 (emphasis added). Because nothing in the pre-*Chevron* decision in *Wood* precluded the panel from finding that the statutory language was ambiguous "under *Chevron* step one," the panel concluded that it was free to reach its own conclusion on that score, and it held that the provision was ambiguous. *Id*.**[2]**

---

**[2]** Under the "two-step framework announced in *Chevron*," a court first "ask[s] whether the statute is ambiguous and, if so," the court then addresses, at step two, "whether the agency's interpretation is reasonable." *King v. Burwell*, 135 S. Ct. 2480, 2488 (2015); *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999).

Moving to step two of *Chevron*, the panel then upheld the BIA's standard as a reasonable interpretation of the ambiguous phrase "single scheme of criminal misconduct," and it therefore denied Szonyi's petition. *Szonyi*, 915 F.3d at 1233–35. In the panel's view, *Wood* did not preclude it from reaching this conclusion because *Wood* "did not directly address the reasonableness of the BIA's approach under *Chevron* step two other than to reject it in favor of our court's own interpretation." *Id*. at 1234.

### III

My disagreement with the panel is narrowly focused, but nonetheless significant. For the reasons explained below, *see infra* at 23–26, I agree with the panel that *Brand X* requires us to apply a *Chevron* analysis in determining whether, notwithstanding our prior decision in *Wood*, we should now yield to the BIA's construction of the statutory phrase "not arising out of a single scheme of criminal misconduct." With respect to step one of the *Chevron* analysis, I agree with the panel that the statutory language is ambiguous, and that nothing in *Wood* requires a contrary conclusion. But in my view, the construction that has been adopted by the BIA is an unreasonable reading of the statutory language under *Chevron* step two, and it should be rejected.

### A

In *Brand X*, the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the *unambiguous terms* of the statute and thus leaves no room for agency discretion." 545 U.S. at 982 (emphasis

added).   Under this standard, *Wood*'s construction of the
"single scheme" language would be deemed controlling, and
would excuse us from deferring to a competing reasonable
interpretation by the BIA, only if *Wood* compels the
conclusion, at step one of *Chevron*, that the statute is
unambiguous.   As the Court explained, *Brand X* "hold[s]
judicial interpretations contained in precedents to the same
demanding *Chevron* step one standard that applies if the court
is reviewing the agency's construction on a blank slate."   *Id*.

    In determining whether a statute is ambiguous, "a court
must exhaust all the 'traditional tools' of construction."
*Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (making this
observation with respect to the interpretation of agency rules,
but noting that *Chevron* "adopt[ed] the same approach for
ambiguous statutes"); *see also Epic Sys. Corp. v. Lewis*, 138
S. Ct. 1612, 1630 (2018) (explaining that under *Chevron*,
"deference is not due unless" the traditional tools of
construction do not resolve the ambiguity).   I agree with the
panel's conclusion that, under *Chevron* step one, the relevant
statutory language at issue here is ambiguous.   *See Szonyi*,
915 F.3d at 1233–34.   To say that multiple offenses arise out
of a "single scheme of criminal misconduct" clearly denotes
that those offenses are discernably *connected* in some
overarching way, either as part of a "plan or program," a
"crafty, unethical project," or a "systematic plan" comprising
a "combination of thoughts, theories, or the like, connected
and adjusted by design."   WEBSTER'S 2D NEW INT'L
DICTIONARY 2234 (1934); *see also Scheme*, BLACK'S LAW
DICTIONARY (11th ed. 2019) (defining "scheme" as either a
"systemic plan; a connected or orderly arrangement, esp. of
related concepts" or as an "artful plot or plan, usu. to deceive
others").   But this language leaves substantial room for
judgment as to the critical question of how broadly or

narrowly to define a "*single* scheme"—*i.e.*, *how much* of a connection is required between separate crimes before they should be considered part of a single plan, program, or project. No traditional tool of statutory construction resolves this ambiguity, because there is no other meaningful textual clue in the statute and no other applicable canon of construction provides relevant guidance.[3]

I also agree with the panel that our decision in *Wood* provides no obstacle to concluding that the statute is ambiguous. *Szonyi*, 915 F.3d at 1233–34. As we have construed it, our decision in *Wood* did two things: (1) it held that the BIA's interpretation was inconsistent with the plain statutory language; and (2) it proceeded to adopt its own affirmative interpretation. *See supra* at 16–17. The first of these holdings does not establish that the statute's meaning is unambiguous, because it merely says that the *particular* reading adopted by the BIA lacked support in the actual statutory language. In modern parlance, that is more in the nature of a *Chevron* step-two analysis, because it essentially says that the agency's reading of the language was unreasonable. *See also infra* at 32–33. Nor does our second holding in *Wood* establish that the statute is unambiguous, because *Wood* adopted its affirmative construction only after

---

[3] Given that the Supreme Court has repeatedly held that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms [in the INA] concrete meaning through a process of case-by-case adjudication," *Negusie*, 555 U.S. at 517 (citations and internal quotation marks omitted), it seems clear that, at least at step one of *Chevron*, a court may not simply rely on "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). Invoking such an immigration rule of lenity at *Chevron* step one would effectively eliminate all ambiguities, leaving no room for deference to the BIA at step two.

noting that the statute did "not define what is a 'single scheme of criminal misconduct'"; that "the legislative history" did not "shed any light on what was the intent of Congress in drafting this provision"; that "[i]f there is any doubt as to the interpretation of this provision, that doubt must be resolved in favor of the alien"; and that there was sufficient record evidence to allow a conclusion that the multiple crimes in *Wood* arose from a "single scheme." 266 F.2d at 828–30. This second holding in *Wood* is thus more an affirmation of ambiguity than a refutation of it.

Because *Wood* did not hold that the "single scheme" language was unambiguous or that our affirmative construction of that phrase "follows from the unambiguous terms of the statute," *Brand X*, 545 U.S. at 982, *Wood* provides no justification for "refusing to apply *Chevron* to the [BIA's] interpretation" of that phrase. *Id*. at 984. Accordingly, the panel properly proceeded to step two of *Chevron*.

**B**

I disagree with the panel's conclusion that the BIA's construction of the statute is reasonable under *Chevron* step two.

**1**

To decide whether deference must be given to the BIA's construction of the phrase "not arising out of a single scheme of criminal misconduct," one must first determine what that construction is. The BIA's interpretation of that phrase is actually somewhat hard to discern, because it is not stated in a single, definitive, self-contained operative test. Rather, the

BIA's construction consists of a set of related propositions that it has repeated in many cases (including this one). Each of these propositions uses somewhat different phrasing, and their relation to one another is at first blush not entirely clear. A careful review of these propositions confirms that, under the BIA's construction, the "single scheme" exception applies *only* when two crimes follow so closely together that the offender essentially had no opportunity to cease his activities and reflect on what he had done. That is the standard that the BIA applied in rejecting Szonyi's invocation of the "single scheme" exception.

**a**

According to the BIA's first and most general proposition, the BIA construes the reference to "conduct not arising from a single scheme 'to mean [that] when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct.'" *See Matter of Szonyi*, slip op. at 3 (BIA Oct. 21, 2015) (quoting *Matter of Adetiba*, 20 I. & N. Dec. at 509). Taken literally and by itself, this construction would read the key phrase, "not arising out of a single scheme of criminal misconduct," out of the statute: it says that *any* two distinct criminal acts render the alien deportable, and it recites no exception to that rule. Instead, it simply lists a set of considerations that will *not* constitute exceptions to this rule. Because this proposition says literally nothing about when the exception *would* apply, it provides no affirmative construction of the "single scheme" exception at all.

**b**

The BIA's decision also paired this general rule with the additional proposition that "two offenses are not part of a 'single scheme of criminal misconduct' when the acts are distinct and neither offense causes (or constitutes) the other." *See Matter of Szonyi*, slip op. at 3 (citing *Matter of Adetiba*, 20 I. & N. Dec. at 509). The statement that two crimes are outside the "single scheme" exception only if, at a minimum, they are "distinct" acts adds literally nothing to the first proposition discussed above. And, in any event, it is tautological: if the two crimes are not even distinct acts, but are rather the same act, then they are part of a "single scheme" under *any* conceivable definition.

The BIA's additional phrase—that the single scheme exception does *not* apply when "neither offense causes (or constitutes) the other"—*does* provide some affirmative content to that exception. By defining the conditions in which the exception will not apply, this proposition logically tells us what is necessary in the BIA's view to *avoid* that rule of inapplicability: it must be shown that one of the offenses "causes (or constitutes) the other." *See Matter of Szonyi*, slip op. at 3; *see also Matter of Adetiba*, 20 I. & N. Dec. at 509. Accordingly, this second proposition says that two distinct acts will be considered part of a "single scheme of criminal misconduct" *only* if one of the offenses "causes (or constitutes) the other."

**c**

The BIA also recited a third proposition, namely, that "the single scheme exception relates to acts performed in furtherance of a single criminal episode even though the acts

may constitute separate crimes in and of themselves, such as where one crime is a lesser included offense of another or two crimes flow from and are the natural consequence of a single act of criminal misconduct." *Matter of Szonyi*, slip op. at 3 (quoting *Matter of Adetiba*, 20 I. & N. Dec. at 509) (internal quotation marks omitted).  On its face, this seems to acknowledge a broader exception than the second proposition, because it suggests more generally that any separate criminal acts "performed in furtherance of a single criminal episode" will constitute a "single scheme of criminal misconduct."  But for several reasons, it is clear that the BIA has not adopted any such broad rule.

Notably, this broader articulation of the "single scheme" exception is followed by what seem to be two non-exhaustive examples (which are introduced by the non-limiting phrase "such as").  Those two examples, however, exactly mirror the more limited exception articulated in proposition two above. The first example is "where one crime is a lesser included offense of another," which corresponds to the situation in which one offense "constitutes the other."  The second example is when "two crimes *flow from and are the natural consequence of* a single act of criminal misconduct" (emphasis added), and that seems to be another way of saying that one of the offenses "causes . . . the other."  The result is a certain tension between the BIA's two articulations of the exception—one articulation seems to limit it to *only* two specific categories (*i.e.*, lesser included offenses and crimes in which one directly leads to the other), and the other articulation seems to say that those two categories are merely illustrative of a broader exception (*i.e.*, a broader exception under which any crimes that were "performed in furtherance of a single criminal episode" would be considered a "single scheme").

Szonyi sought to take advantage of that tension by arguing that his crimes *were* "performed in furtherance of a single criminal episode" even though those crimes were *not* lesser included offenses of one another and were not crimes in which one directly caused the others. Indeed, this case seems to fall precisely in the space between these two propositions, because Szonyi's crimes were unquestionably part of a "single criminal *episode*" as that phrase would normally be understood. Thus, if the BIA's third proposition were in fact broader than its second proposition, Szonyi should have won, and the fact that he did not confirms that the BIA treats this third proposition as adding nothing to the second. In my view, the panel therefore correctly rejected Szonyi's reading of the BIA's precedent and instead construed propositions two and three as effectively saying the same thing. *Szonyi*, 915 F.3d at 1237.

**d**

This reading of the BIA's second and third propositions is reinforced by a fourth proposition recited by the agency. The BIA also stated that a second crime does *not* flow from, and is *not* the natural consequence of, the first crime when each act "accomplished a specific criminal objective in itself" and the petitioner had "an opportunity to reflect upon one crime before committing another." *Matter of Szonyi*, slip op. at 3. This was the critical basis on which the IJ and the BIA rejected petitioner's argument that his crimes were part of a single scheme of criminal misconduct: according to the BIA, "[a]fter the abuse of any one victim, the respondent had the opportunity to cease his activities and reflect on what he had done." *Id*. at 3. This reasoning and result confirm that the BIA does *not* recognize a broader exception under which any

two crimes that further a single "criminal episode" will be deemed to "aris[e] out of a single scheme."

*          *          *

The bottom line is that, under the BIA's view, two crimes are part of a "single scheme of criminal misconduct" only if one is a lesser included offense of the other or one crime causally leads to the other in the narrow sense that the BIA has described. Moreover, the lesser-included-offense rule is not actually an exception at all, because lesser included offenses are not properly considered to be two offenses in the first place. As such, they do not constitute "*two* or more crimes involving moral turpitude," and the BIA's inclusion of lesser included offenses in the exception to that two-crimes rule adds nothing. As a result, the *only* thing that falls within the exception, according to the BIA, are *two crimes that follow so closely together that the offender essentially had no opportunity to cease his activities and reflect on what he had done*.

**2**

Thus understood, the BIA's very narrow construction of the statutory exception may make eminent policy sense, but it is an unreasonable reading of the actual words in the statutory phrase "arising out of a single scheme of criminal misconduct." It therefore fails step two of the *Chevron* analysis.

Under any ordinary usage of the word "scheme," that word would not be limited, as the BIA would have it, to a set of immediately successive actions that are not separated by any opportunity for deliberation. According to Webster's

Second (which is presumably a reasonable reference point for this 1952 enactment), a "scheme" denotes a "plan or program of something to be done"; a "project," especially a "crafty, unethical project"; or a "systematic plan" comprising a "combination of thoughts, theories, or the like, connected and adjusted by design." Webster's 2d New Int'l Dictionary 2234 (1934); *see also Scheme*, Black's Law Dictionary (11th ed. 2019) ("scheme" is a "systemic plan; a connected or orderly arrangement" or an "artful plot or plan"). This concept of a single plan of *interconnected elements* is not captured by the BIA's construction; indeed, that construction does not seem to be grounded in *any* serious analysis of the meaning of the word "scheme."

The gap between what the statute says and what the BIA construes it to mean is perhaps best illustrated by the following example: under the BIA's reading, two separate emails that are sent days apart in furtherance of a single scheme to defraud (each of which is a separate violation of the wire fraud statute) would apparently *not* "aris[e] out of a single scheme of criminal misconduct." Under the BIA's analysis, each email is a distinct crime ("because the commission of one can occur without the commission of the other," *Matter of Szonyi*, slip op. at 3); neither is a lesser included offense of the other; and (given the opportunity for reflection between the two emails) the second email cannot be said to have flowed from or to have been caused by the first. This is an unreasonably narrow and atextual reading of the statutory exception.

We recognized the fundamental problems in the BIA's interpretation more than sixty years ago in our decision in *Wood*. On this score, it is critical again to distinguish the two separate holdings of *Wood*, in which (1) we rejected the

BIA's reading as impermissibly divorced from the statutory language; and (2) we then proceeded to adopt our own interpretation. *See supra* at 16–17. The first holding necessarily translates, in *Chevron* step-two terms, into a conclusion that the BIA's construction is unreasonable and not entitled to deference. As *Wood* explained, the BIA has effectively rewritten the "single scheme" exception "as if it read 'single criminal *act*.'" 266 F.2d at 830 (emphasis added); *see also id*. (statute "says 'not arising out of a single scheme of criminal misconduct'; it does *not* say 'not arising out of a single criminal *act*'"). Because *Chevron* step two requires deference only to an agency's reasonable construction of the meaning of the words of the ambiguous statute, it does not require (or permit) us to defer to an interpretation that essentially rewrites the statute's text so that it is more to the agency's liking. *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). And we cannot permit an agency to disregard the legislative text merely because the agency has adopted a substantively reasonable policy (as is arguably the case here). The agency's policy choices must be made within the bounds established by Congress in adopting the statutory text that *constrains* those choices. Where, as here, the agency has disregarded the limits Congress set in the statutory language, its policy choice merits no deference under *Chevron*.

This aspect of our decision in *Wood*—i.e., that the agency's construction of the "single scheme" exception is not a permissible interpretation of the statutory text—remains binding precedent on the panel, and it controls the answer to the *Chevron* step-two inquiry. Under *Wood*, the agency's reading of the exception is unreasonable, and it must be

rejected. Because no subsequent decision of the Supreme Court or this court has undermined *Wood* on this point, the panel was obligated to follow it, and the panel should have rejected the BIA's construction. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Because the panel failed to follow controlling precedent on this point, we should have taken this case en banc.

The panel correctly notes that seemingly all other circuits have now acquiesced in the BIA's reading, *see* 915 F.3d at 1234–35, and it suggests that the BIA's analysis is not so unreasonable as to warrant creating a circuit split. That, of course, is irrelevant under *Miller v. Gammie*, because the panel was obligated to follow Ninth Circuit precedent absent intervening higher authority that is "irreconcilable" with *Wood*—and there is none. 335 F.3d at 900. Moreover, in fairness to the other circuit courts in most of these cases, it is not clear that the facts presented to them brought into comparably sharp relief the extraordinary narrowness of the BIA's position. *See*, *e.g.*, *Balogun v. INS*, 31 F.3d 8, 8–9 (1st Cir. 1994) (rejecting Ninth Circuit's *Wood* test, and holding that BIA properly rejected petitioner's expansive view that a two-year "continuing criminal enterprise" constitutes a "single scheme"); *Chavez-Alvarez v. Attorney Gen.*, 850 F.3d 583, 586–87 (3d Cir. 2017) (holding that under BIA's test, sexual assault was not part of "single scheme" with subsequent false denials of assault to investigators). *But see Akindemowo v. INS*, 61 F.3d 282, 286–87 (4th Cir. 1995) (endorsing BIA's narrow reading and applying it to immediately successive uses of bad checks in two stores on a single visit to a shopping mall). In all events, we should no more acquiesce in our sister circuits' misapplication of *Chevron* deference in construing the meaning of the statute

than we should accede to the BIA's unwarranted invocation of that deference.

## IV

The last remaining question is what consequence should follow from the BIA's flawed construction of the "single scheme" exception in this case.

I do not believe that the answer should be to require the BIA to follow the alternative construction that we adopted in *Wood* and *Gonzalez-Sandoval*. *Brand X* seems to foreclose that possibility, because it states that "a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative," and the BIA therefore remains free to "choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." 545 U.S. at 983. The only exception would be if our affirmative reading of the statute in *Wood* "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id*. at 982. For the reasons stated earlier, I agree with the panel that *Wood*'s alternative construction is not compelled by the statutory text. *See supra* at 25–26.

Indeed, I agree with the BIA, and with some of our sister circuits, that *Wood*'s construction is itself wrong. At a minimum, the *Wood* test is sufficiently questionable that the BIA, exercising its authority under *Brand X*, may properly adhere to its rejection of that test. Under the *Wood* test, where "two predicate crimes were *planned* at the same time and executed in accordance with that plan," they "arise out of 'a single scheme of criminal misconduct.'" *Gonzalez-Sandoval*, 910 F.2d at 616 (emphasis added); *see also Szonyi*,

915 F.3d at 1233–34.  In my view, the BIA has correctly criticized this construction of the statute, because it erroneously gives dispositive weight to the alien's purely *subjective* intention to commit a series of otherwise unrelated crimes.  (Ironically enough, the IJ in this case initially found that the *Wood* exception was inapplicable on its own terms precisely because Szonyi did *not* pre-plan his crimes.)  As the BIA noted, *Wood*'s construction would produce anomalous results:  a criminal mastermind who pre-plans an extended crime spree would escape deportation, but a lesser criminal who engages in exactly the same spree without such a preconceived plan would not.  *Matter of Adetiba*, 20 I. & N. Dec. at 511.  I do not disagree with the BIA's apparent judgment that the word "scheme" requires some *objective* link between the crimes; the problem is instead that the BIA has defined that objective link so narrowly as to amount to a "single act" test rather than a "single scheme" test.

Accordingly, it would seem that the proper course would be to remand the matter to the BIA for it to adopt a new construction that interprets, rather than rewrites, the statute. That was also the course the Supreme Court followed when confronted with an analogous situation in *Michigan v. EPA*, 135 S. Ct. 2699 (2015).  There, after setting aside the agency's construction of a statute as unreasonable because it failed to account for costs, and after holding that the statute did not "unambiguously" require a particular method of accounting for cost, the Court left it to the agency on remand "to decide (as always, within the limits of reasonable interpretation) how to account for cost."  *Id*. at 2711. Because the BIA's construction is unreasonable, and our

competing construction is not unambiguously required, the proper course would be to remand to the agency.[4]

I respectfully dissent from the denial of rehearing en banc.

---

**OPINION**

CLIFTON, Circuit Judge:

Istvan Szonyi petitions for review of a decision by the Board of Immigration Appeals ("BIA") upholding a final order of removal against him. This case presents the question of whether the BIA permissibly interpreted the phrase "single scheme of criminal misconduct" under 8 U.S.C. § 1227(a)(2)(A)(ii). In that statute, the phrase operates as an exception to a ground for removal. Specifically, the statute provides that a person is deportable if he has been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." We previously adopted a different, broader interpretation of the phrase in *Wood v. Hoy*, 266 F.2d 825 (9th Cir. 1959), an interpretation we reaffirmed in *Gonzalez-Sandoval v. INS*, 910 F.2d 614 (9th Cir. 1990), and *Leon-Hernandez v. INS*, 926 F.2d 902 (9th Cir. 1991). Because the phrase in question operates as an exception to a ground for deportation, the BIA's narrower definition of the exception serves to broaden the application of the removal provision, making Szonyi

---

[4] Unless and until the BIA were to adopt a new construction, it would be premature to address whether applying any such construction to Szonyi would raise retroactivity concerns. *Cf. Szonyi*, 915 F.3d at 1235–36 (addressing whether retroactive application of the BIA's interpretation to Szonyi was improper).

subject to removal when he might not have been under our previous definition.

We uphold the BIA's interpretation under the principles of *Chevron* deference that apply when the BIA interprets immigration laws. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). We also conclude that the BIA properly applied this interpretation here, and that this application was not impermissibly retroactive. In addition, we uphold the BIA's denial of discretionary relief, acknowledging the limitations on judicial review of discretionary decisions. *See* 8 U.S.C. § 1252(a)(2)(B)(i). Accordingly, we deny Szonyi's petition for review.

## I.  Background

Szonyi is a citizen of Hungary who was admitted to the United States as a lawful permanent resident in 1957, when he was four years old. In 1981, after a day of heavy drinking, he forced three women to commit sexual acts under threat of violence over a five- to six-hour period. For those acts, Szonyi pled guilty to two counts of oral copulation in violation of California Penal Code § 288a(c) and two counts of sexual penetration with a foreign object in violation of California Penal Code § 289. Based on these offenses, the government commenced removal proceedings against Szonyi in 2005, eventually charging him as removable because he had been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct" under 8 U.S.C. § 1227(a)(2)(A)(ii).

The immigration judge ("IJ") sustained that charge. In a written order filed on September 19, 2011, the IJ found Szonyi removable because his predicate crimes involved

moral turpitude and did not arise out of a single scheme of criminal misconduct under Ninth Circuit precedent. The IJ also determined that the positive equities in Szonyi's case did not offset his adverse criminal history and therefore denied his request for a waiver of inadmissibility and cancellation of removal. The IJ ordered Szonyi's removal to Hungary, and Szonyi timely appealed to the BIA.

While Szonyi's appeal was pending, the BIA issued a precedential opinion in *Matter of Islam*, 25 I. & N. Dec. 637 (BIA 2011), which announced that the BIA would apply its preferred interpretation of "single scheme of criminal misconduct" in all circuits, including those that had previously interpreted that phrase more expansively. *Id*. at 641. In light of *Matter of Islam*, the BIA remanded Szonyi's appeal to the IJ for analysis under the BIA's "single scheme" jurisprudence.

On remand, the IJ again found Szonyi removable because his crimes did not arise out of a single scheme under BIA precedent. The IJ also incorporated by reference her earlier decision (1) finding Szonyi removable under the Ninth Circuit's standard and (2) denying discretionary relief. The BIA affirmed, finding Szonyi removable under the BIA's interpretation of the single scheme exception. The BIA also agreed with the IJ that Szonyi did not merit discretionary relief.

Szonyi filed a timely petition for review.

## II. Removability

Szonyi challenges the BIA's conclusion that he is removable because he has been convicted of "two or

more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." 8 U.S.C. § 1227(a)(2)(A)(ii). Szonyi argues that (1) the BIA's interpretation of the Immigration and Nationality Act ("INA") is foreclosed by Ninth Circuit precedent; (2) the BIA's interpretation is unreasonable; (3) even if the BIA's interpretation is permissible, it cannot be applied to him retroactively; and (4) even if the BIA's interpretation is permissible, the BIA misapplied that interpretation to the facts of his case. We are not persuaded by any of these arguments.

> 1. *BIA Interpretation of "Single Scheme of Criminal Misconduct"*

In *Matter of Adetiba*, 20 I. & N. Dec. 506 (BIA 1992), the BIA affirmed its longstanding interpretation of "single scheme of criminal misconduct" under § 1227(a)(2)(A)(ii), which it said would apply in all circuits except those that had adopted their own more expansive interpretation of the term. *Id.* at 510. The BIA's interpretation was that:

> when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct.

*Id.* at 509. As noted above, the BIA later announced it would apply the *Adetiba* standard uniformly across all circuits in *Matter of Islam*, 25 I. & N. Dec. at 641. Szonyi argues that Ninth Circuit precedent forecloses the BIA's interpretation.

As a preliminary matter, the government argues that this court lacks jurisdiction to consider the permissibility of the BIA's interpretation because Szonyi failed to exhaust this argument before the BIA. A petitioner's failure to raise an argument before the BIA generally constitutes a failure to exhaust, thus depriving this court of jurisdiction to consider the issue. *See Barron v. Ashcroft*, 358 F.3d 674, 677–78 (9th Cir. 2004). However, "[s]ome issues may be so entirely foreclosed by prior BIA case law that no remedies are 'available … as of right' with regard to them before IJs and the BIA." *Sun v. Ashcroft*, 370 F.3d 932, 942 (9th Cir. 2004). Where the agency's position "appears already set" and recourse to administrative remedies is "very likely" futile, exhaustion is not required. *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1991). Because the BIA's position appeared set based on its precedential opinion in *Matter of Islam*, 25 I. & N. Dec. 637, Szonyi did not have to exhaust his challenge to the BIA's interpretation, and we have jurisdiction to review his claim.

We review legal questions de novo. *Chavez-Garcia v. Sessions*, 871 F.3d 991, 995 (9th Cir. 2017). When considering the BIA's interpretation of the INA as set forth in a published BIA opinion, we follow the two-step *Chevron* framework. *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 815 (9th Cir. 2016).

Under *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If Congress has done so, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If Congress has not specifically addressed the question, the court must defer to the agency's interpretation if it is "based

on a permissible construction of the statute." *Id.* This is true even if there is contrary circuit precedent, unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Although this circuit previously interpreted "single scheme" more broadly than the BIA, no circuit precedent forecloses the BIA's interpretation.

Szonyi argues that this court concluded in *Wood*, 266 F.2d 825, that the BIA's interpretation is incompatible with the language of the statute. In *Wood*, we rejected the BIA's interpretation as "not what the statute says" because the BIA "applied the statute as if it read 'single criminal act'" rather than "single scheme of criminal misconduct." 266 F.2d at 830. Our decision also noted, however, that the INA did not itself define the term, and that the legislative history did not shed any light on Congress's intent in drafting the provision. *Id.* at 828–29. We therefore interpreted the phrase for ourselves.

Subsequent cases have interpreted *Wood* as establishing this circuit's precedent that:

> where credible, uncontradicted evidence, which is consistent with the circumstances of the crimes, shows that the two predicate crimes were planned at the same time and executed in accordance with that plan, we must hold that the government has failed in its burden to establish that the conviction did not arise out of "a single scheme of criminal misconduct" within the meaning of [the INA].

*Gonzalez-Sandoval*, 910 F.2d at 616. Thus, in contrast to the BIA's approach, our previous interpretation of "single scheme of criminal misconduct" encompassed distinct crimes that were part of the same overall plan.

*Wood* was decided before *Chevron*, so we did not in that decision have reason to apply the *Chevron* framework and did not specifically comment on the ambiguity of the statutory text under *Chevron* step one. We did not say, though, that our interpretation "follow[ed] from the unambiguous terms of the statute," which would foreclose the agency's approach under *Brand X*, 545 U.S. at 982. *See Wood*, 266 F.2d at 828–29. The *Wood* decision likewise did not directly address the reasonableness of the BIA's approach under *Chevron* step two other than to reject it in favor of our court's own interpretation. *Id.* at 830. Our rationale for the conclusion was our own interpretation of the text, the absence of useful legislative history, and resolution of any interpretive doubt in favor of the alien where deportation might result. *Id.*

Szonyi also cites two post-*Chevron* cases that reaffirmed *Wood*'s interpretation of "single scheme," but neither case considered the permissibility of the BIA's interpretation. In *Gonzalez-Sandoval*, we reversed a BIA decision that relied on the First Circuit's standard rather than the *Wood* standard in interpreting "single scheme." 910 F.2d at 615. In *Leon-Hernandez*, we mentioned the standards from *Wood* and *Gonzalez-Sandoval* in affirming the BIA's decision without mentioning any different BIA standard. 926 F.2d at 905. In sum, contrary to Szonyi's argument, there is no circuit precedent holding that the text of the statute unambiguously forecloses the BIA interpretation.

Our decision here is consistent with the decisions of other circuits that have considered the BIA's interpretation after *Chevron*. *See, e.g.*, *Balogun v. INS*, 31 F.3d 8 (1st Cir. 1994); *Chavez-Alvarez v. Attorney Gen. United States*, 850 F.3d 583 (3d Cir. 2017); *Akindemowo v. INS*, 61 F.3d 282 (4th Cir. 1995); *Iredia v. INS*, 981 F.2d 847 (5th Cir. 1993); *Abdelqadar v. Gonzales*, 413 F.3d 668 (7th Cir. 2005); *Nguyen v. INS*, 991 F.2d 621 (10th Cir. 1993).

The Fourth Circuit noted in 1995, when it accepted the BIA's interpretation, that at the time only the Second, Third, and Ninth Circuits did not follow the BIA's interpretation. *Akindemowo*, 61 F.3d at 286. In 2000, the Second Circuit called into question its contrary pre-*Chevron* interpretation and effectively appeared to join the circuits following the BIA's interpretation in *Michel v. INS*, 206 F.3d 253 (2d Cir. 2000). The majority in *Michel* concluded that it did not need to decide whether the BIA's "single scheme" interpretation was reasonable under *Chevron*, but it specifically noted that the precedent in which it had stated its different interpretation of the statute, *Nason v. INS*, 394 F.2d 223 (2d Cir.1968), was decided before *Chevron*. It further noted that it had "held, in post-*Chevron* cases, that the BIA is entitled to deference when interpreting other provisions of the Immigration and Nationality Act, as long as those interpretations are reasonable." 206 F.3d at 260. Judge Cabranes wrote separately to argue that the BIA interpretation of the relevant statute was entitled to deference and should be so recognized formally. *Id.* at 266 (Cabranes, J., concurring). As for the Third Circuit, in 2017 that court "join[ed its] fellow Courts in concluding that the BIA's interpretation is reasonable." *Chavez-Alvarez*, 850 F.3d at 587. We alone remain.

   2.  *Reasonableness of BIA Interpretation*

Szonyi further argues that even if the BIA's interpretation is not foreclosed by circuit precedent, it is impermissible based on congressional intent and constitutional avoidance. As noted above, we already determined in *Wood* that the legislative history did not shed any light on Congress's intent regarding this provision. 266 F.2d at 828–29.

We are also unpersuaded by the arguments raised by Szonyi and amicus that the canon of constitutional avoidance requires a different interpretation. The Supreme Court's recent vagueness jurisprudence is distinguishable from the present case because those cases focused on the abstract nature of the residual clause inquiry. *See Johnson v. United States*, 135 S. Ct. 2551, 2557–58 (2015) (holding that a provision of the Armed Career Criminal Act was unconstitutionally vague because judicial assessment of risk was tied to "a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements" and "indeterminacy about how to measure the risk posed by a crime [was combined] with indeterminacy about how much risk it takes for the crime to qualify as a violent felony"); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018) (striking down a similar provision because it "has the same '[t]wo features' that 'conspire[d] to make [ACCA's residual clause] unconstitutionally vague'" (alterations in original)). Because the "single scheme" exception is not tied to a judicially-imagined "ordinary case" and instead relies on a case-specific determination, it does not present the same uncertainty concerns the Supreme Court identified in *Johnson* and *Dimaya*.

### 3. *Retroactive Application of the BIA Standard*

Szonyi argues that even if the BIA approach is a permissible construction of the statute, the agency cannot retroactively apply that standard in this case. Under our test for retroactivity, we consider:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982). Applying this test, we conclude that the BIA's application of its standard to Szonyi's case was permissible.

We have recognized that the first factor "is not well suited for immigration rulings." *Acosta-Olivarria v. Lynch*, 799 F.3d 1271, 1275 (9th Cir. 2015). The parties agree that it is irrelevant here.

"The second and third factors are intertwined" and "will favor retroactivity if a party could reasonably have anticipated the change in the law such that the new requirement would not be a complete surprise." *Lemus v. Lynch*, 842 F.3d 641, 649 (9th Cir. 2016) (quotations omitted). Szonyi notes that at the time he pled guilty, courts in most jurisdictions applied a more expansive interpretation

of "single scheme of criminal misconduct" than the one the BIA adopted in *Matter of Islam* and applied here. *See Matter of Adetiba*, 20 I. & N. Dec. at 510. As of then, however, the BIA had not clearly indicated whether it would follow these broader interpretations or its own precedent. It was not until 1992, a decade after Szonyi pled guilty, that the BIA announced that it would apply its interpretation outside circuits, like the Ninth Circuit, that had adopted a more expansive interpretation. *Id*. at 511. Thus, at the time Szonyi pled guilty, it should not have come as a "complete surprise" that the BIA would apply an interpretation that held him removable. *See Lemus*, 842 F.3d at 649. On balance, the second and third factors favor the government.

In immigration cases, we have held that "the fourth factor favors non-retroactive application because deportation is unquestionably a substantial burden." *Martinez-Cedillo v. Sessions*, 896 F.3d 979, 994 (2018). The government argues Szonyi would be removable even under the Ninth Circuit's single-scheme jurisprudence. But there is "a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *I.N.S. v. St. Cyr*, 533 U.S. 289, 325 (2001). Therefore, to the extent there was any uncertainty about Szonyi's removability under the Ninth Circuit standard but no such ambiguity under the BIA standard, the fourth factor favors Szonyi.

The fifth factor generally favors the government "because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 523 (9th Cir. 2012).

In sum, the second, third, and fifth factors favor retroactive application of the BIA interpretation, while the fourth factor favors Szonyi. On balance, we conclude that the retroactive application of the BIA's interpretation was not improper. *See Martinez-Cedillo*, 896 F.3d at 994 (holding retroactive application permissible based on the same balance of factors).

### 4.  The BIA's Application of Its Standard

Szonyi further argues that even under BIA precedent he should not be removable. The BIA did not directly address the cases Szonyi has cited to us, probably because Szonyi did not raise them before the BIA, but it is not hard to infer the distinctions that the BIA presumably would have drawn. We conclude that the BIA's analysis was consistent with its precedent.

The BIA started its analysis by citing the interpretation of the relevant language set out in *Matter of Adetiba*, 20 I. & N. Dec. at 509–11. It then agreed with the IJ's finding that Szonyi's offenses against multiple victims over the course of six hours did not fall within a single scheme because, quoting from the IJ's decision, "the acts, though similar in character, [were] distinct, because the commission of one can occur without the commission of the other." The BIA also noted that the crimes did not constitute lesser included offenses of another crime and were not a natural consequence of a single act of criminal misconduct. While the BIA noted that Szonyi's convictions covered conduct occurring on the same day in the same location, it observed "that the crimes occurred over a period of 6 hours did not deprive the respondent of an opportunity to reflect upon one crime before committing another." *Id*.

The BIA's conclusion was consistent with its statement in *Matter of Adetiba* that its prior cases had treated "single scheme" as "meaning there must be no substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done." 20 I. & N. Dec. at 509–10. The dissent concludes we cannot discern whether or how the BIA applied this standard. However, the BIA explicitly concluded that "[a]fter the abuse of any one victim, the respondent had the opportunity to cease his activities and reflect on what he had done." The dissent finds it significant that the BIA did not say there was a "substantial interruption" between the crimes, but the BIA has qualified that term as one that would allow the respondent to "reflect on what he has done." *Matter of Adetiba*, 20 I & N. Dec. at 509–10. The BIA found that Szonyi had such an opportunity here, and "[t]he BIA's factual findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Villavicencio v. Sessions*, 904 F.3d 658, 663–64 (9th Cir. 2018). We do not read the record as compelling a conclusion that Szonyi had no opportunity to reflect on his acts over a period of five or six hours while subjecting three separate women to nonconsensual sexual acts.

Szonyi argues that the BIA previously interpreted "single scheme" to include all crimes "performed in furtherance of a single criminal episode." He contends that all of his acts were "in furtherance of a single criminal episode" that began when he pulled out a gun and continued for the next six hours as he performed nonconsensual sexual acts with multiple women. In quoting from BIA precedent, however, Szonyi omits the remainder of the relevant sentences, which clarify the meaning of "single criminal episode." Both *Matter of Islam* and *Matter of Adetiba* define "single scheme" as acts

"performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *See Matter of Islam*, 25 I. & N. Dec. at 639; *Matter of Adetiba*, 20 I. & N. Dec. at 511. The BIA applied that standard here, describing "single criminal episode" as including "where one crime is a lesser included offense of another or two crimes 'flow from and are the natural consequence of a single act of criminal misconduct.'"

Szonyi also argues that the BIA's conclusion in this case is at odds with the discussion in other precedential BIA cases of what constitutes a "single scheme," including "convictions for indecent fondling of two minors in the same room at the same time," *see Matter of Z-*, 8 I. & N. Dec. 170, 175 (BIA 1958); situations where "A, B, & C are robbed by the alien at the same time," *see Matter of B-*, 8 I. & N. Dec. 236, 239 (BIA 1958); and convictions for assault with intent to do great bodily harm and manslaughter where the alien (1) pushed his mother-in-law down the stairs, then a few minutes later (2) stabbed his wife with a knife, *Matter of Pataki*, 15 I. & N. Dec. 324, 326 (BIA 1975). Szonyi argues that in light of these decisions, the BIA erred in treating as irrelevant the fact that Szonyi's convictions covered conduct occurring on the same day.

The BIA had previously made clear that the fact that multiple crimes occurred on the same day did not mean that they were necessarily part of a single scheme. *See, e.g.*, *Matter of D-*, 5 I. & N. Dec. 728, 729 (BIA 1954) ("The fact that one [crime] may follow the other closely, even immediately, in point of time is of no moment."). The cases Szonyi cited to us were all distinguishable based on their

facts. For example, in *Matter of Pataki*, the BIA concluded that convictions for assault and manslaughter against separate victims constituted a "single scheme" because they "were committed within a few minutes of each other as the result of the same criminal impulse in the course of the same episode." 15 I. & N. Dec. at 325–26. As the Board described, the crimes occurred when, in a "rage, the [alien] pushed his mother-in-law down the stairs. The rage continued to the point that a few minutes later, he went for a knife and then stabbed his wife." *Id*. at 326. That two crimes committed within a few minutes of each other as part of one rage were held to fall within the same scheme does not mean that sexual crimes committed over a span of six hours against separate victims necessarily fell within a single scheme. Similarly, while both *Matter of Z-*, 8 I. & N. Dec. at 175, and *Matter of B-*, 8 I. & N. Dec. at 239, described acts occurring "at the same time" or "one time," the time period was not more specifically defined in either case. The BIA could have reasonably concluded those episodes were distinguishable from crimes committed over six hours.

Although the BIA did not specifically distinguish Szonyi's case from these other decisions, it is understandable that it did not do so where Szonyi failed to argue before the BIA that his case was comparable to those cases or to any of its precedents. The dissent concludes that Szonyi's brief to the BIA clearly placed the issue of substantial interruption before the BIA by citing *Matter of Adetiba* and *Matter of Islam*, but the BIA also directly followed the tests laid out in those opinions to conclude that Szonyi's acts did not fall within a single scheme. The BIA should not be faulted for not distinguishing additional cases that Szonyi did not raise before the agency when he had the opportunity.

## III.    Discretionary Relief

Szonyi applied for two forms of discretionary relief: waiver of inadmissibility under former section 212(c) of the INA, 8 U.S.C. § 1182(c), and cancellation of removal under 8 U.S.C. § 1229b(a). This court lacks jurisdiction to review the merits of a discretionary decision to deny cancellation of removal, but it does have jurisdiction to review whether the IJ considered relevant evidence in making this decision. *Vilchez v. Holder*, 682 F.3d 1195, 1198 (9th Cir. 2012). "[T]he BIA abuses its discretion when it fails to consider all favorable and unfavorable factors bearing on a petitioner's application for § 212(c) relief." *Zheng v. Holder*, 644 F.3d 829, 833 (9th Cir. 2011).

Szonyi argues that the BIA failed to consider all favorable and unfavorable factors bearing on his eligibility for waiver of inadmissibility and cancellation of removal. In making this argument, Szonyi only looks to the BIA's reasoning, arguing that this court's review is limited to the BIA decision because the BIA conducted de novo review of the IJ's decision. Szonyi is correct that when the BIA reviews questions of discretion de novo under 8 C.F.R § 1003.1(d)(3)(ii), this court's review is limited to the BIA's decision, "except to the extent that the BIA expressly adopted the IJ's decision." *Vilchez*, 682 F.3d at 1199.

Here, the BIA announced it was conducting de novo review but also acknowledged "that the Immigration Judge adequately and correctly considered and addressed the respondent's equities and the adverse factors contained in the record." We may look to the IJ's decision when "the BIA incorporates parts of the IJ's reasoning as its own." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 (9th Cir. 2010). This

court has also reviewed the IJ's decision, and the BIA's opinion appeared to adopt the IJ's decision by giving examples from it. *See Morgan v. Mukasey*, 529 F.3d 1202, 1206 (9th Cir. 2008). The IJ expressly considered in her first decision and explicitly incorporated into her second decision the positive equities Szonyi claims the BIA erroneously failed to consider.

Even if the IJ's opinion were disregarded, this court generally presumes that the BIA thoroughly considers all relevant evidence in the record. *Larita-Martinez v. INS*, 220 F.3d 1092, 1095–96 (9th Cir. 2000); s*ee also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) ("When nothing in the record or the BIA's decision indicates a failure to consider all the evidence, a 'general statement that [the agency] considered all the evidence before [it]' may be sufficient." (citation omitted, alterations in original)). Here, the BIA generally recognized "positive equities in [Szonyi's] favor" and specifically recognized that these included his lengthy residence in the country, military service, steady employment, payment of taxes, charitable work, citizen sister, and various physical disabilities that require medical treatment. Given the general presumption that the BIA considered all relevant factors, the BIA did not abuse its discretion in denying relief.

## IV.    Conclusion

The petition for review is denied.

**PETITION FOR REVIEW DENIED.**

FISHER, Circuit Judge, dissenting:

I agree with much of the majority opinion but disagree with the majority's conclusion that the Board of Immigration Appeals (BIA) reasonably applied its precedent to this case. Maj. Op. 48–51. BIA precedent squarely holds that two or more crimes committed during a single criminal episode arise from a single scheme of criminal conduct, and hence do not render an individual removable under 8 U.S.C. § 1227(a)(2)(A)(ii), unless they are marked by a "*substantial interruption* that would allow the participant to disassociate himself from his enterprise and reflect on what he has done" between crimes. *Matter of Adetiba*, 20 I. & N. Dec. 506, 509–10 (BIA 1992) (emphasis added). Because we cannot discern whether or how the BIA applied this precedent in this case, where the petitioner's crimes were part of a single and continuous criminal episode, and there is nothing in the record to suggest there was a "substantial interruption" between the crimes, I would grant the petition for review and remand to the BIA for an adequate explanation. *See Eneh v. Holder*, 601 F.3d 943, 947–48 (9th Cir. 2010). Although our review of BIA decisions is limited and deferential, we may not deny a petition for review where, as here, we are left to speculate as to the BIA's reasoning, and where we cannot discern from the record whether the BIA misapplied its own precedent. *See Alphonsus v. Holder*, 705 F.3d 1031, 1049 (9th Cir. 2013), *abrogation on other grounds recognized by Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). I therefore respectfully dissent.

## I

Istvan Szonyi was admitted to the United States, at the age of four or five, in 1957. In 1981, he was convicted of

four criminal offenses involving two victims – two counts of unlawful oral copulation in violation of California Penal Code § 288a(c) and two counts of unlawful penetration in violation of California Penal Code § 289. He was sentenced to 12 years in prison, and released from prison in 1988.

The record tells us that Szonyi's offenses arose out of a single, continuous and horrific criminal episode: Szonyi invited three women into his nearby place of work, where he threatened, abused and degraded them over a period of five or six hours. The record does not, however, reveal when during this five or six hour period the four criminal offenses for which Szonyi was convicted occurred. Nor does it explain how much time elapsed between the offenses, or whether there was a substantial interruption between them.

In 2005, the Department of Homeland Security commenced removal proceedings against Szonyi. Relying on the 1981 convictions, the government charged Szonyi with being removable under 8 U.S.C. § 1227(a)(2)(A)(ii), which states:

> Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, *not arising out of a single scheme of criminal misconduct*, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1227(a)(2)(A)(ii) (emphasis added). The BIA agreed with the government that Szonyi was removable because he was convicted of multiple offenses of moral turpitude "not arising from a single scheme." Szonyi timely

petitioned for review.  The majority would deny the petition.
I would grant it.

## II

The term "arising out of a single scheme of criminal
misconduct" is not defined by the Immigration and
Nationality Act.  The BIA, however, has defined the term in
a series of precedential decisions, holding that, "to be a
'single scheme,' the scheme must take place at one time,
meaning there must be no *substantial interruption* that would
allow the participant to disassociate himself from his
enterprise and reflect on what he has done."  *Matter of
Adetiba*, 20 I. & N. Dec. at 509–10 (emphasis added); *accord
Matter of Islam*, 25 I. & N. Dec. 637, 640, 642 (BIA 2011).

In adopting this substantial interruption rule, the Board
followed the First Circuit's decision in *Pacheco v. INS*,
546 F.2d 448 (1st Cir. 1976).  *See Matter of Adetiba*, 20 I. &
N. Dec. at 509–11.  In *Pacheco*, the First Circuit held that
"the intent of Congress in [adopting the 'single scheme'
language] was to give 'a one-time alien offender . . . a second
chance before he could be deported.'"  *Pacheco*, 546 F.2d at
451 (second alteration in original) (quoting *Nason v. INS*,
394 F.2d 223, 227 (2d Cir. 1968)).  Thus, "a scheme, to be a
'single scheme', must take place at one time; there must be
no substantial interruption that would allow the participant to
disassociate himself from his enterprise and reflect on what
he has done."  *Id.*  The court explained that "both the purpose
of the statute and the use of the adjective 'single' point to a
temporally integrated episode of continuous activity.  When
the immediate activity has ended, even though a 'scheme'
calls for future activity a participant has his second chance to
make a decision."  *Id.* at 452.

The Board also cited its own decision in *Matter of Pataki*, 15 I. & N. Dec. 324 (BIA 1975), as exemplifying the substantial interruption rule. *See Matter of Adetiba*, 20 I. & N. Dec. at 510. In *Matter of Pataki*, 15 I. & N. Dec. at 325, the respondent pled guilty to two crimes occurring on the same day – an assault on his mother-in-law and a subsequent assault on his wife. The BIA sustained the immigration judge's conclusion that the two crimes were part of a "single scheme of criminal misconduct":

> This evidence indicates that the crimes for which the respondent was convicted stem from a marriage problem. In his rage, the respondent pushed his mother-in-law down the stairs. The rage continued to the point that a few minutes later, he went for a knife and then stabbed his wife. We are satisfied that both crimes were committed within a few minutes of each other as the result of the same criminal impulse in the course of the same episode. This evidence is probative of the existence of a single scheme.

*Id.* at 326.

Szonyi invoked the BIA's "substantial interruption" precedent here. Citing *Matter of Adetiba* and *Matter of Islam*, he correctly argued in his brief to the BIA that "for a course of criminal misconduct to constitute a single scheme it must take place at one time with no substantial interruption that would provide the perpetrator the opportunity to disassociate himself and reflect on the criminal enterprise." Administrative Record 11. He then argued that the criminal acts he committed constituted a "single scheme of criminal

misconduct," because "there was no substantial interruption" that would have allowed him "to disassociate himself from his enterprise." *Id.* at 12–13.

The BIA did not meaningfully address this argument. To be sure, the Board said in a conclusory fashion that Szonyi had an opportunity between offenses to reflect on what he had done and to disassociate himself from the criminal enterprise:

> [T]hat the crimes occurred over a period of 6 hours did not deprive the respondent of an opportunity to reflect upon one crime before committing another. After the abuse of any one victim, the respondent had the opportunity to cease his activities and reflect on what he had done. Accordingly, the respondent was convicted of multiple offenses of moral turpitude not arising from a single scheme.

But the BIA did not provide any *basis* for concluding that Szonyi had an opportunity to reflect upon one crime before committing another. Significantly, the Board did not say that there was a substantial interruption between the crimes.

Our case law makes clear that the BIA must adequately explain its decisions. As we said in *Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) (en banc),

> the BIA must provide "a reasoned explanation for its actions." *Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir. 2005). "Due process and this court's precedent require a minimum degree of clarity in dispositive

reasoning and in the treatment of a properly raised argument." *Su Hwa She v. Holder*, 629 F.3d 958, 963 (9th Cir. 2010). The BIA must be clear enough that we need not "speculate based on an incomplete analysis." *Id.* at 964; *see also Eneh v. Holder*, 601 F.3d 943, 947 (9th Cir. 2010).

*Id.* at 1107.

The Board has not discharged that duty here. Did it conclude that a "substantial interruption" is not required? If so, how can it reconcile that conclusion with its decisions in *Matter of Adetiba* and *Matter of Islam*? *See Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc) ("[W]e find that the BIA misapplied its own precedent . . . . Accordingly, we grant [the] petition for review and remand to the BIA for further proceedings."); *Israel v. INS*, 785 F.2d 738, 740 (9th Cir. 1986) ("The BIA acts arbitrarily when it disregards its own precedents and policies without giving a reasonable explanation for doing so."). Did it instead conclude that there *was* a "substantial interruption" in this case? If so, why didn't it say so, and what is the basis in the record for that conclusion?

The majority concludes that the substantial interruption requirement is satisfied in Szonyi's case because the crimes were "committed over a span of six hours." Maj. Op. 51. But this reasoning is unpersuasive. First, our review must be based on the BIA's reasoning, not our own. *See Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) ("If we conclude that the BIA's decision cannot be sustained upon its reasoning, we must remand to allow the agency to decide any issues remaining in the case."). Second, because the record

does not reveal when during these five or six hours Szonyi's crimes of conviction occurred, it does not support the majority's conclusion that they were committed "over a span of six hours." They may have occurred within "a few minutes of each other," as in *Matter of Pataki*, 15 I. & N. Dec. at 326.[1] Third, even assuming arguendo that the crimes occurred over hours rather than minutes, the BIA has never held that a passage of time or the duration of a continuous criminal episode, without more, establishes a substantial interruption. As *Pacheco* makes clear, "a temporally integrated episode of continuous activity," as apparently occurred here, constitutes a single scheme, not two separate schemes. 546 F.2d at 452.[2]

---

[1] *See also Matter of B-*, 8 I. & N. Dec. 236, 239 (BIA 1958) (holding that a "single scheme" exists when "there are a series of similar acts which occurred at 'one time,'" as when "A & B are indecently fondled at the same time"); *Matter of Z-*, 8 I. & N. Dec. 170, 175 (BIA 1958) (explaining that "convictions for indecent fondling of two minors in the same room at the same time" are "so related in time and purpose as in reality to constitute" a single scheme).

[2] The BIA's decision in *Matter of Islam* provides an example of a case in which multiple crimes committed on a single day *were* marked by a substantial interruption. There, the respondent admitted that

> "on March 22, 2008, he used or attempted to use two different credit and debit cards belonging to another individual on five separate occasions to purchase goods." According to the Immigration Judge, the respondent "drove to four different locations and made five purchases over the span of a few hours." The locations where the cards were used were in two adjoining counties and involved different retail outlets, including Auto Zone and Walmart. During one transaction involving a stolen credit card, the respondent told the cashier that the card belonged to his

The majority says the Board's failure to "distinguish Szonyi's case from . . . other decisions . . . is understandable" because "Szonyi failed to argue before the BIA that his case was comparable to those cases or to any of its precedents." Maj. Op. 51. Szonyi's brief to the BIA, however, cited the BIA's two key decisions on the substantial interruption issue – *Matter of Adetiba* and *Matter of Islam*[3] – and made the substantial interruption issue the centerpiece of his BIA appeal. *See* Administrative Record 11–13. It is, in fact, difficult to see what more Szonyi could have done to place the issue before the Board. It is true that Szonyi's brief before the BIA did not mention some other BIA decisions, such as the two decisions discussed above in footnote 1. But this is of no moment. Szonyi squarely presented the substantial interruption issue to the Board. The BIA, therefore, was bound to address the issue in a manner that would allow for meaningful appellate review.

The majority alternatively suggests we can uphold the BIA's decision by relying on the deferential standard of review we apply to the BIA's findings of fact. The majority notes that the BIA found Szonyi "had the opportunity to cease

---

girlfriend.

25 I. & N. Dec. at 638 (alteration omitted). The BIA held that "the respondent's crimes, while occurring in a single day, did not arise from a 'single scheme' of criminal misconduct," because, "[a]fter use of any one credit card, the respondent had the opportunity to disassociate himself from his enterprise and reflect on what he had done." *Id.* at 642 (alteration omitted). Here, by contrast, it is far from clear that there was a substantial interruption between Szonyi's offenses.

[3] *Matter of Adetiba*, in turn, cited *Matter of Pataki* as exemplifying the substantial interruption rule. *See Matter of Adetiba*, 20 I. & N. Dec. at 510.

his activities and reflect on what he has done," and argues that the record does not compel "a conclusion that Szonyi had no opportunity to reflect on his acts over a period of five or six hours while subjecting three separate women to nonconsensual sexual acts." Maj. Op. 49. I cannot agree.

*First*, the issue in this case is whether Szonyi had an opportunity to reflect between the *actual crimes* for which he was *convicted*. 8 U.S.C. § 1227(a)(2)(A)(ii). Szonyi was not convicted of assaulting three women, and he was not convicted of engaging in assaults over a period of five or six hours. He was convicted of four unlawful acts involving two women, and the record is silent as to when those acts occurred in relation to one another. *Second*, although we have a duty to defer to the Board's findings of fact, we do not defer to mere speculation. *See Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir. 2000) ("We have said it before and we say it again: conjecture and speculation can never replace substantial evidence."). Here, there is nothing in the record to show that any time elapsed between the actual crimes for which Szonyi was convicted. Hence, *if* the BIA relied on the theory that *time elapsed* between Szonyi's crimes, then the BIA relied on speculation, and its finding is not supported by substantial evidence. If the BIA alternatively relied on the theory that *no time lapse was required*, then the BIA needed to reconcile that conclusion with its own precedent. *See Matter of Adetiba*, 20 I. & N. Dec. at 509–10 (holding that there must be a "substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done"); *Matter of Islam*, 25 I. & N. Dec. at 640, 642 (same); *Matter of Pataki*, 15 I. & N. Dec. at 326 (holding that two distinct crimes involving different victims, committed within a few minutes of each, resulting from the same criminal impulse and committed in the course

of the same episode arose out of a "single scheme of criminal misconduct"); *Matter of B-*, 8 I. & N. Dec. at 239 (holding that a "single scheme" exists when "there are a series of similar acts which occurred at 'one time," as when "A & B are indecently fondled at the same time"); *Matter of Z-*, 8 I. & N. Dec. at 175 (same). The standard of review offers no shelter here.

### III

On this record, I would grant the petition for review and remand for the BIA to adequately explain its decision. BIA precedent clearly requires a "substantial interruption" between offenses, and Szonyi squarely placed this issue before the BIA. The BIA, however, did not address it, leaving us to speculate whether the BIA disregarded the "substantial interruption" requirement, in contravention of its own precedent, or concluded that there was a "substantial interruption" between offenses in this case, but without saying so and without pointing to anything in the record to support that conclusion. Absent an adequate explanation, we cannot effectively review the Board's decision.